## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Michael Vinh, | Case No. 18-cv-01679 (SRN/ECW) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Express Scripts Services Company, | |
| Defendant. | |

Rolf Fiebiger and Thomas D. Fiebiger, Fiebiger Law, 6800 France Avenue South, Suite 190, Edina, MN 55435, for Plaintiff.

Brent D. Kettelkamp and Hal A. Shillingstad, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 225 South Sixth Street, Suite 1800, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter comes before the Court on Defendant Express Scripts Services Company's ("ESSC" or "Defendant") Motion for Summary Judgment (Doc. No. 39).  For the following reasons, ESSC's motion is granted.

## I.     BACKGROUND

This case arises out of a claim of disability discrimination under the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.01 *et. seq.* (2018), brought by Plaintiff Michael Vinh against Express Scripts Services Company, his former employer.  In setting forth the factual background of the case, the Court is mindful that in considering ESSC's summary judgment motion, it must "view[] the evidence in the light most favorable to the

nonmoving party, namely Vinh.  *Grinnell Mut. Reinsurance Co. v. Schwieger*, 685 F.3d 697, 700 (8th Cir. 2012) (citation omitted) (internal quotation marks omitted).  Moreover, the Court does not "weigh the evidence and determine the truth of the matter itself[.]"  *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012) (citation omitted).

## A.   The Parties

Plaintiff Michael Vinh is a Minnesota resident who worked at Express Scripts Services Company from May 2000 through May 2016.  (Compl. [Doc. No. 1-1] ¶¶ 1–2.) Vinh holds a degree in health fitness from Gustavus Adolphus College, and a master's degree in leadership from Augsburg University.  (Shillingstad Decl. Ex. A ("Vinh Dep. Tr.") [Doc. No. 43-1] at 21, 27–28.)  Since his termination from ESSC, Vinh has started his own business selling various products.  (*Id.* at 30–31.)

Defendant Express Scripts Services Company[1] is a pharmacy benefit management service company that provides a host of services to pharmacies.  (Compl. ¶ 2; Answer [Doc. No. 6] at ¶2.)  At all relevant times, Vinh worked out of ESSC's Bloomington, Minnesota location.  (Compl. ¶ 2.)[2]

---

[1]    The original defendant in this action was Express Scripts, Inc.  (*See generally* Compl.)  Early in the case, the parties jointly moved to replace Express Scripts, Inc. with Express Scripts Services Company, Vinh's actual employer, (*see* Joint Mot. to Substitute Party [Doc. No. 7].), which was subsequently granted.  (*see* July 20, 2018 Order Substituting Def. [Doc. No. 12].)

[2]    The parties do not dispute personal jurisdiction.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) (2018), as the parties are citizens of different states and the amount in controversy is over $75,000.  (*See* Def.'s Notice of Removal [Doc. No. 1] at 3–4.)  Venue is proper because a "substantial part of the events . . . giving rise to the claim occurred" in Minnesota. 28 U.S.C. § 1391(b)(2) (2018).

### B.      Vinh's Employment at Express Scripts Services Company

### 1.      Hiring & Progression to Senior Project Manager

Vinh was hired by ESSC in May of 2000 as a customer services representative. (Vinh Dep. Tr. at 53–55.)   At or around the time he was hired, Vinh received and acknowledged receipt of ESSC's equal employment opportunity and nondiscrimination policies. (*Id.* at 56–60.)  During the first few years at ESSC, Vinh's position changed from customer service representative, to a Contact Center Associate, then Contact Center Supervisor. (*Id.* at 62–64.)  In 2005, he was promoted to Project Manager, and in 2006 or 2007 was promoted to Senior Project Manager. (*Id.* at 65–67, 69.)  Vinh held the title of "Senior Project Manager" until his termination in May of 2016. (*Id.* at 66–67.)

A position of senior project manager at ESSC has a broad job description. (*See* Fiebiger Decl. Ex. 4 (Senior Project Manager Job Description) [Doc. No. 48-1].)  While the parties dispute the exact job requirements, they do agree that Vinh was responsible for "[d]irection and management related to strategic projects across multiple sites," "[m]entoring [the] development of continuous improvements [to] drive business," "developing and maintaining site improvement plans, communication plans, schedules, and estimates," and managing "cross-functional strategic planning projects, provid[ing] content/idea creation, develop[ing] strategic planning communications (verbal and written), and . . . managing and synthesizing strategic topics." (Vinh Dep. Tr. at 67–69.) Also listed as "minimum qualifications" for the position were "extensive project management skills," and "[s]trong verbal and written communication and organizational

skills." (Senior Project Manager Job Description at 2.) "Communicating" was a "[m]ajor" activity for the position, occurring 60% or more during work hours. (*Id.* at 3.)

### 2. ESSC's Review and Calibration Process

ESSC conducts mid-year and annual reviews of employees at Vinh's senior level. Moreover, at all relevant times, ESSC utilized a two-stage process for conducting those performance reviews. First, an employee's supervisor creates a "Calibration Profile" containing a summary of the employee being evaluated, including details about the employee's position and the supervisor's thoughts on the employee's strengths and weaknesses, among other things. (Decl. of Brian Hogg (Hogg Decl.) [Doc. No. 42] ¶ 8.) The supervisor also provides an initial rating of the employee's performance: "threshold" (the lowest, or worst, rating meaning "not meeting expectations"), "target" (the middle, or "average," rating), or "stretch" (the highest, or best, rating). (*See* Shillingstad Decl. Ex. H (Huber Dep. Tr.) [Doc. No. 43-2] at 38; *see also* Shillingstad Decl. Ex. E (Morris Dep. Tr.) [Doc. No. 43-1] at 29.) Within the "target" category, a supervisor could also rate an employee "low target" or "high target." (Huber Dep. Tr. at 38.)

Second, after creating a Calibration Profile for a given employee, the supervisor forwards the profile for "Calibration," which consists of a two-stage review by the directors and senior directors of the employee and his peer group. (Hogg Decl. ¶¶ 9–10.) The "calibration" process compares employee initial ratings "head-to-head" to provide the employee a rating reflecting his performance among his or her peers. (*Id.*) The employee's initial rating is placed into a 15-box grid containing the ratings of his or her peers. (*Id.* ¶ 13–14.) Then the directors and senior directors of the employee's peer group meet to

"calibrate" the employee's performance rating compared to his or her peers. (*Id.* ¶ 16–17.) This first meeting compares the employee's performance to his or her local group of peers. (*Id.*) A second meeting then takes place comparing the employee to all peers under the director's and senior director's supervision. (*Id.* ¶ 22–23; *see also* Vinh Dep. Tr. at 80–81.) The final output of those calibration meetings constitutes the employee's performance rating. (Hogg Decl. ¶ 27.)

### 3.    Vinh's Performance in 2013 and 2014

In 2013, Vinh was still working as a Senior Project Manager, and was supervised by Bill Rogler. (Vinh Dep. Tr. at 77.) Following the calibration process discussed above, Vinh was rated "threshold" for his performance in 2013. (Vinh Dep. Tr. at 78–79.) The performance rating and review stated that "2013 was a challenging year" for Vinh. (*See* Shillingstad Decl. Ex. G (2013 Vinh Performance Review) [Doc. No. 43-1] at 1.) It noted that when calibrated against a "smaller set of [Vinh's] peers" Vinh was rated a "Low Target" but when compared "head to head" against the entire Senior Manager peer group within his division, Vinh "fell to 'Threshold.' " (*Id.*) Rogler noted that Vinh needed to "significantly improve his communication skills and take greater initiative" and that his failure to do so "will limit his potential" at the company. (*Id.*) With respect to being a key liaison between various business partners, Rogler noted that Vinh needed to "take a stronger, more active role in coordinating with cross-functional partners . . . ." (*Id.* at 2.) Vinh's strategic thinking skills were also rated poorly, with Rogler noting that Vinh needed to "improve his 'big picture' and strategic thinking[.]" (*Id.* at 5.) With respect to communication, Rogler noted Vinh had "good ideas" but that he "struggled to convey them

5

effectively, in both written and in oral communication," and that he was soft-spoken which tended to " 'lose' or confuse meeting participants during regular . . . conference calls." (*Id.* at 5–6.)  Finally, Rogler also noted that Vinh needed to improve on "direction setting, ongoing communication, goal setting and team leadership," and again highlighted Vinh's poor communication and presentation skills.  (*Id.* at 6.)  When asked about this 2013 review, Vinh acknowledged that his "threshold" ranking meant he was "lower" in the ranking system than "those who did the typical work" of his job, and that communication was a skill he "always need[s] to improve on."  (Vinh Dep. Tr. at 83–84.)  He also acknowledged that based on his 2013 review, he needed to "play a more active role in setting up meetings with the senior directors and coordinating those meetings outside of [his] role . . . ."  (*Id.* at 87.)

In 2014, Vinh's performance improved.  Following the calibration process, he was rated "target," or "average," as a Senior Project Manager, and his performance review noted that he was "instrumental" in the implementation of several business goals.  (*See* Shillingstad Decl. Ex. I (2014 Vinh Performance Review) [Doc. No. 43-2] at 1–2.)  It also noted that Vinh had "worked hard" to "be a better more aggressive leader" and that he had "stepped up and worked on taking more initiative."  (*Id.* at 4.)  Finally, Vinh's performance review noted that he had "improved his management presence and delivery on [the company's] issue calls" although the review did indicate that Vinh needed "to continue to develop" in that area.  (*Id.*)

#### 4.      Vinh's Performance in Early 2015

Ashly Huber, a director at ESSC, became Vinh's new supervisor in 2015.  (Vinh Dep. Tr. at 103–104; Huber Dep. Tr. at 14.)   Under Huber, Vinh was responsible for communicating with numerous "cross-functional" teams about the various initiatives they were working on to save operational costs.  (Vinh Dep. Tr. at 103–104.)  Throughout the majority of 2015, Vinh and Huber held weekly one-on-one meetings, usually by telephone. (*Id.* at 106.)  Huber took contemporaneous handwritten notes from those meetings.  (Huber Dep. Tr. at 35, 50; *see also* Shillingstad Decl. Ex. J (Huber 2015 Handwritten Vinh Notes) [Doc. No. 43-2].)

From January 2015 through May 2015, Huber's notes indicate several failures on Vinh's part to adequately perform his job.  For example, in January, Huber noted that she had discussed Vinh's future role, his responsibilities for creating various tracking data, and that he had missed a "deliverable" that had to be discussed in two separate conversations. (Huber 2015 Handwritten Vinh Notes.)  In February, she noted that while Vinh had done a good job of creating a "good base" for a User Guide he was working on, he needed to work on simplifying the guide and putting it in a more logical sequence.  (*Id.*)  With respect to Vinh's data skills, Huber indicated that Vinh needed to "be questioning more of [the] tracker" data that he was reviewing and "not taking it for face value."  (*Id.*)   In March, Huber informed Vinh that the work he had done on a set of PowerPoint slides he was working on was "Target to Low Target" and that a "High Target" rating required "flawless documentation [with] draft instructions . . . ."  (*Id.*)  She also provided him feedback in response to a question from Vinh about "where he needs work."  (*Id.*)  And in April, Huber

informed Vinh that while he had good ideas related to certain initiatives, his communications regarding review of certain data changes needed to be more "to the point[,]" with "clear messaging" that "set the stage" for the reader.  (*Id.*)  Ultimately, Huber explained that these issues reflected, in her opinion, Vinh's habit of leaving out key details when he was trying to articulate a point, an error that should not occur at his seniority level.  (Huber Dep. Tr. at 79.)  Huber also noted that while Vinh had good ideas, he failed when it came to executing those ideas.  (*Id.* at 80.)  With respect to these criticisms, Vinh remembers receiving a few complaints about his formatting of PowerPoints and emails, but does not recall anything else.  (Vinh Dep. Tr. at 109–110.)  Vinh admits that he was not suffering from any medical issues during this first half of 2015.  (Vinh Dep. Tr. at 110.)

### 5. Huber's Maternity Leave, Vinh's Diagnosis, & Vinh's 2015 Mid-Year Performance Review

From June 1, 2015 through the end of August 2015, Huber was out on maternity leave.  (Huber Dep. Tr. at 44.)  During that time, Huber did not keep in contact with ESSC other than to provide her feedback regarding Vinh's performance during the first half of 2015, and to say goodbye to a supervisor who was moving on to a different role in the company.  (*Id.* at 44–45.)  During Huber's absence, Brian Hogg took over as Vinh's temporary supervisor.  (Hogg Decl. ¶¶ 3–4; Vinh Dep. Tr. at 112.)  At about the same time, Vinh began experiencing pain in his neck that was so severe it required him to take time off to attend appointments with various doctors.  (Vinh Dep. Tr. at 114.)  Vinh requested intermittent leave through June, July, and August of 2015 to address his medical needs, which ESSC approved.  (*Id.* at 114, 116.)  Prior to June 2015, Vinh did not report any

8

medical concerns to ESSC.  (*Id.* at 107–109.)  In mid-July 2015, Vinh was diagnosed with complex cervical dystonia.  (*Id.* at 117.)

Cervical dystonia, also known as "spasmodic torticollis," is a "muscle contracture deformity where . . . particular muscle[s] will spasm [or] tighten" because they are "not being regulated or gated properly" by the brain.  (Shillingstad Decl. Ex. R (Spurrill Dep. Tr.) [Doc. No. 43-2] at 13.)  Essentially, "there is a breakdown in proper communication between the brain and the muscle[.]"  (*Id.*)  There is no known cause for cervical dystonia (*id.* at 14), although the condition usually occurs in adults and tends to progress slowly. *See Spasmodic Torticollis*, Stedmans Medical Dictionary 92670, available on Westlaw (database updated Nov. 2014).  Vinh's treating doctor, Dr. Troy Spurrill, indicated that "stress"—mental, physical, or chemical—can cause the condition, and that "[c]ertain people are genetically predisposed" to the condition.  (Spurrill Dep. Tr. at 14.)  There is no cure for cervical dystonia; it is considered chronic.  (*Id.* at 14–15.)  Treatment generally consists of various light or eye movement therapy and other forms of physical rehabilitation and exercise.  (*Id.* at 17.)  Botox treatments may also help, although they address only the symptoms, not the underlying problem.  (*Id.* at 18.)

In early July 2015, Brian Hogg began putting together Vinh's 2015 mid-year performance review.  (*See* Hogg Decl. ¶ 3–4.)  Because he had not supervised Vinh from January through May of 2015, Hogg relied on Huber's evaluation of Vinh's performance, supplemented by his own observations from June through mid-July of 2015, to create Vinh's mid-year 2015 Calibration Profile.  (*Id.* ¶¶ 5–7; *see also* Hogg Decl. Ex. 1 (July 20, 2015 Huber Review of Vinh) [Doc. No. 42-1].)  Huber and Hogg both provided an initial

tentative rating of "low target" for Vinh's performance for the first half of 2015.  (*See* Hogg Decl. Ex. 2 (2015 Vinh Calibration Profile) [Doc. No. 42-1].)  The profile noted that Vinh had a "[s]trong work ethic and willingness to improve," was good at building "relationships with upper level management[,]" and had good ideas.  (*Id.*)  However, the profile also noted that Vinh needed to find "ways to show more leadership skills" and be more "proactive in finding way[s] to improve tracking measures" and his "critical thinking skills[.]"  (*Id.*)  Moreover, the profile indicated that Vinh needed to work on "[p]aying attention to detail[,]" noting his supervisors "often [had] to question [him] on whether or not what he is reporting makes sense to him" and that he was not "think[ing] critically enough" in his job. (*Id.*)  Finally, the profile noted Vinh needed improvement on executing his ideas.  (*Id.*)

After Vinh's 2015 calibration profile was created, it was forwarded on for two calibration meetings—which did not involve Huber—against a smaller set of peers and a larger set of peers.  (Hogg Decl. ¶¶ 19–22, 26.)  With respect to the smaller set of peers, the directors and senior directors rated Vinh "threshold," rendering him the lowest rated employee within his peer group.  (*Id.* ¶¶ 16–17, 19–20.)  Later, when compared to a larger set of Vinh's peers, Vinh was again rated "threshold" making him the lowest rated employee out of all "I-level" employees.  (*Id.* ¶¶ 23, 25.)  In early August 2015, following these calibrations, Vinh's final 2015 mid-year ranking was determined to be "threshold." (*Id.* ¶ 27; *see also* Hogg Decl. Ex. 2 (2015 Vinh Initial Calibration) [Doc. No. 42-1] at 3, 5; *Id.* Ex. 4 (2015 Vinh Final Calibration) at 4.)  This rating meant Vinh was the lowest rated employee on the "bell curve" of ratings among his peers.  (Huber Dep. Tr. at 85, 87.) Notably, while Vinh's performance review occurred within the same time period that he

began experiencing cervical dystonia symptoms, he does not recall his condition having any impact on his work in 2015 other than needing to take time off to see a doctor.  (Vinh Dep. Tr. 122–123.)  He also admits that no one at ESSC ever expressed any objection to Vinh taking time off for his medical condition, and he never had any problems receiving benefits from ESSC at any time.  (*Id.* at 139–141.)

Huber returned to work in late August or early September of 2015 and was informed that Vinh had been out on intermittent leave for health issues.  (Huber Dep. Tr. at 44, 46; Vinh Dep. Tr. at 137–138.)  After her return, Huber called Vinh to discuss his 2015 mid-year performance review.[3]  (Huber Dep. Tr. at 73.)  Her notes indicate that they discussed Vinh's "threshold" rating, the need for a performance improvement plan (referred to as a "Positive Direction" (*see* Huber Dep. Tr. at 59–60 (noting that "Positive Direction" is another name for performance improvement plan at ESSC)), and the potential for termination if Vinh did not want to follow such a plan.  (Huber 2015 Handwritten Vinh Notes (8/31).)  Shortly after that, Huber's notes reflect that Vinh disclosed for the first time that he had been diagnosed with cervical dystonia.  (*Id.* (9/2).)  Vinh and Huber discussed possible treatment options and the potential need for a longer leave of absence.  (Huber Dep. Tr. 50–53; *see also* Huber 2015 Handwritten Vinh Notes (9/18).)

---

[3]     The parties disagree about whether Huber discussed Vinh's 2015 mid-year performance review with him before or after he went out on extended leave.  Huber asserts she did not do so while he was on medical leave, while Vinh asserts that his mid-year review occurred a few days after he went out on medical leave.  (*Compare* Huber Dep. Tr. at 73, 91, *with* Vinh Dep. Tr. at 120 (noting the review happened "a couple days after [he] was on leave").

In early September, Dr. Spurrill recommended that Vinh go on extended leave. (Vinh Dep. Tr. 134.)  Pursuant to that recommendation, Vinh went on extended leave approved by ESSC on September 30, 2015.  (*Id.*)  Notably, as of the date he went on leave, Vinh does not believe that ESSC or anyone working for the company engaged in any discriminatory behavior towards him.  (*Id.*)

### 6.      Vinh's Return to Work and Work Restrictions

In late January of 2016, Vinh was approved to return to work by Dr. Spurrill and resumed work on February 15, 2016.  (Spurrill Dep. Tr. at 58; Vinh Dep. Tr. at 145.)  In conjunction with his return, Dr. Spurrill prepared a "Return To Work" (RTW) form using a template provided by ESSC listing several restrictions related to Vinh's work; the restrictions were effective from February 8 through April 8, 2016.  (*See* Shillingstad Decl. Ex. U (Vinh RTW Form) [Doc. No. 43-2].)

Pursuant to the RTW form, Vinh was limited to a six-hour workday, permitted to stand or walk once per hour, and only allowed to sit for up to one hour at one time.  (*Id.*; Spurrill Dep. Tr. at 60.)  It also contained various lifting and carrying restrictions, but permitted use of his hands for keyboarding and other fine motor skill tasks.  (Vinh RTW Form.)   Under restriction number ten on the RTW form, entitled "Other functional limitations or modifications necessary in patient's employment," Dr. Spurrill wrote "Our main concern is sitting at the computer staring at the screen.  The consistent visual stimulation and stress are top priority."  (*Id.*)  Dr. Spurrill explained that this comment was his attempt to convey that stress and visual stimulation were his main concern, although he noted that the other restrictions contained in the RTW form—i.e., the six-hour work days,

sitting and standing limits, etc.—were designed to address that concern.  (Spurrill Dep. Tr. at 62–64.)  Put another way, the statement in restriction number 10 was Dr. Spurrill's method of "expressing a statement of general concern that visual stimulation and stress are things that [were] on [his] radar." (*Id.* at 64.)  Despite numerous questions at his deposition, Dr. Spurrill ultimately testified that his statement in restriction number 10 did not require anything specific from ESSC, and that the other restrictions set forth in the RTW form— such as the limits on sitting, a six-hour work day, etc.—were designed to address his "statement of general concern" in restriction number ten.  (*Id.* at 83–84, 117.)

Vinh admits that ESSC informed him that it would accommodate the restrictions set forth by Dr. Spurrill.  (Vinh Dep. Tr. at 143.)  Upon returning to work, Vinh discussed the accommodations he needed with Huber, who made it clear that Vinh was to follow the requirements and limitations set forth in his RTW form.  (Huber Dep. Tr. 105, 126)  Moreover, to the best of Dr. Spurrill's knowledge, ESSC complied with each and every one of the restrictions listed in Vinh's RTW form, including his "main concern" statement listed in restriction number ten.  (Spurrill Dep. Tr. at 83–84, 117.)

Perhaps the most significant dispute between the parties is whether Vinh requested a standing desk from ESSC to accommodate his disability.  (*Compare* Def.'s Mem. at 18– 19, *with* Pl.'s Opp'n Mem. at 17–18.)  Vinh claims that he requested a standing desk from Huber, and that Huber informed him that she would look into it.  (Vinh Dep. Tr. 146.)  He notes, however, that his request to Huber was verbal, and that she was the only person to whom he made that request.  (*Id.* at 147–148.)  He also acknowledges that he has no written record of the request, and that he has no memory of any request or documentation by his

13

doctor regarding a standing desk.  (*Id.*)  Vinh does, however, point to documentation from Aon Hewitt, ESSC's FMLA management vendor, indicating that at some point, a standing desk was mentioned.  (*See* Fiebiger Decl. Ex. 12 (2016 Aon Hewitt Claim Notes String) [Doc. No. 48-1].)  Those claim notes indicate that as early as January 12, 2016, Vinh told Aon Hewitt that "he is going to need accommodations (special desk)" when he returns to work.  (*Id.*)  As early as January 20, 2016, the claim notes state "Request a standing desk at work."  (*Id.*)  However, later updates to the claim notes also reflect Dr. Spurrill's restrictions on Vinh's work as noted in the RTW form; much like the RTW form itself, there is no indication in the claim notes that a standing desk was listed as a restriction by Dr. Spurrill.  (*Id.*; *see also* Vinh RTW Form.)

Huber has no memory of Vinh requesting a standing desk, and notes that she did not request that one be issued to Vinh.  (Huber Dep. Tr. at 107–108.)  Dr. Spurrill explained that he never listed a standing desk as a restriction for Vinh's work because "the change in position" over the course of the workday—as contemplated by his other RTW restrictions—was what he considered most important.  (Spurrill Dep. Tr. at 65.)  And while two internal notes from Dr. Spurrill's records indicate that a standing desk may have been contemplated by Dr. Spurrill (*see* Shillingstad Decl. Ex. V (1/11/16 & 1/18/16 Spurrill Notes) [Doc. No. 43-2]), Dr. Spurrill did not include such a request in Vinh's RTW form, and does not believe that ESSC failed to follow up on any specific request, incident, event, or other aspect of Vinh's RTW restrictions.  (Spurrill Dep. Tr. at 87.)

### 7.     2015 Annual Review and Performance Improvement Plan

Following his return to work on February 15, 2016, Vinh and Huber discussed Vinh's overall 2015 annual review and his performance rating for the year. (Vinh Dep. Tr. at 154–157; Huber Dep. Tr. at 114.) Because Vinh had been on leave from late September 2015 to February 2016, Vinh's 2015 Annual Review was "essentially the same review" he had received at his mid-year review, and contained largely the same comments about performance and communication issues. (Vinh Dep. Tr. at 154–157, 162–163; Huber Dep. Tr. at 114.) Consistent with his mid-year review, Vinh received a "threshold" performance rating for 2015. (Huber Dep. Tr. at 114; *see also* Shillingstad Decl. Ex. X (2015 Vinh Annual Review) [Doc. No. 43-2].)

On March 2, 2016, Huber met with Vinh to place him on a "Success Rx" plan, which was one name ESSC used to describe a performance improvement plan. (Huber Dep. Tr. at 127, 130; *see also* Compl. ¶ 9; Shillingstad Decl. Ex. Y (Vinh Success Rx Plan) [Doc. No. 43-2].) The plan ran from March 2, 2016 through April 29, 2016, and was put in place because of Vinh's "threshold" rating in 2015. (Vinh Success Rx Plan; *see also* Morris Dep. Tr. at 28 (noting it was a normal practice to put "threshold" employees on Success Rx plans); *Id.* at 76–77 (noting that ESSC was "just picking up where [it] left off with his performance" in the fall before Vinh took an extended leave).) The plan also noted that Vinh's lack of quality in his presentation skills, failure to provide quality work even after feedback, and "[c]ontinuous lack of accuracy or critical thinking while managing the 2015 Ops Tracker and reports" were also triggering events for the plan. (Vinh's Success Rx Plan.) The plan set out four goals Vinh needed to accomplish to be successful:

15

(1) "Ops tracker must be accurate and any discrepancies must be identified with explanation that has been confirmed with appropriate business owner when being reported on to leadership";

(2) "Reports on financial data for Operations reviewed or produced by you must be accurate (numbers match what is in the Ops Tracker, explanations accurate and appropriate Ops leader aligned to data shown for their area)";

(3) "Discrepancies in the data should have clear action items and overall plan for ensuring accuracy"; and

(4) "Presentations must have accurate information, correctly represent [the] current state of the Ops Tracker/Financial/Metric status and be clean of major wording and formatting mistakes."

(*Id.*)  Vinh acknowledges that the triggering events for the plan were consistent with the feedback he had received in 2015, as well as his prior reviews.  (Vinh Dep. Tr. at 167.)

While the plan does not expressly contemplate Vinh's limited work hours, Huber worked with Vinh to ensure that the plan conformed to his work restrictions, and "double checked" with ESSC's Human Resources Department regarding the plan's viability alongside Vinh's reduced work hours.  (*See* Huber Dep. Tr. at 147–151 (noting that the Success Rx plan was drafted "knowing [Vinh] was working a 6 hour day"); Morris Dep. Tr. at 37, 46; Shillingstad Decl. Ex. AA (Mar. 15, 2016 Huber-Morris Email re: Vinh's RTW Restrictions and PIP) [Doc. No. 44].)  Moreover, Vinh himself developed a plan for meeting the four objectives laid out in his Success Rx plan, which is also silent as to his work restrictions or disability.  (Vinh Dep. Tr. at 167–169 (noting that Vinh submitted an initial plan for success, and a revised plan following a conversation with Huber); *see also* Shillingstad Decl. Ex. Z (Vinh's Plan for Meeting Success Rx Plan) [Doc. No. 43-2].)

Over the course of the Success Rx plan's duration, Vinh attempted to meet the four goals laid out in the document.  (Vinh Dep. Tr. at 173–174.)  He met with Huber routinely during the plan (*see id.* at 174, 178; Huber Dep. Tr. 155–156), and received feedback on the continued poor quality of his written communications (Vinh Dep. Tr. at 175) as well as his continued failure to provide Huber with properly formatted information.  (*Id.*)  For example, in a March 11, 2016 email to Huber, Vinh wrote (verbatim): "I know we discussed on numerus occasion on this in the past.  When the business has not access the savings do, we want to show as committed amount?  It would be consider a line of sight item, but the savings have not been blessed. (sic)"  (Shillingstad Decl. Ex. AA (Mar. 2016 Vinh-Huber Email Chain) [Doc. No. 44].)  Huber responded that she was a "little confused" by the question but attempted to answer regardless.  (*Id.*)  Later, Huber sent an email to Vinh providing feedback about his poorly worded email, noting it was not well written, and offering Vinh the chance to further discuss the issue if he felt it was necessary. (Shillingstad Decl. Ex. CC (Mar. 16, 2016 Huber-Vinh Email) [Doc. No. 44].)  Vinh responded that same day, indicating that there was no need to discuss further because he understood that professionalism and accuracy are important.  (Shillingstad Decl. Ex. DD (Mar. 16, 2016 Vinh-Huber Email) [Doc. No. 44].)  Still, despite indicating that he would "make an effort to proofread" prior to sending emails in the future, that same email contains a typographical error.  (*Id.*)

On April 18, 2016, towards the end of his Success Rx plan, Vinh returned to full-time work without any medical restrictions.  (Huber Dep. Tr. at 168.)  Around the same time, Huber emailed ESSC's HR team and sought guidance as to how to proceed with

terminating Vinh's employment.  (*Id.* at 166; Shillingstad Decl. Ex. FF (Apr. 18, 2016 Huber-HR Email) [Doc. No. 44] (noting that Vinh's "Success Rx is up next week and I do not think he has met the right steps to continue his employment").)  To further explain her position, Huber prepared a detailed summary of Vinh's performance under the Success Rx plan, with specific comments for each of the four goals in the plan.  (*See* Shillingstad Decl. Ex. EE (Huber Success Rx Comments) [Doc. No. 44].)

With respect to the first goal—accuracy of the "Ops Tracker" and identification and explanation of data discrepancies—Huber noted that Vinh did a "decent job" of improving, but "still struggle[d] with understanding some of the nuances we have to deal with in terms of when the monthly finance numbers are ready, how we use it against our tracker, and when [it is] appropriate to reach out to [points-of-contact] to update the Tracker."  (*Id.*)  With respect to the second goal—accuracy of financial reporting—Huber noted that Vinh "still struggle[d] with understanding and explaining the work he manages[,]" and that in meetings, it was not "clear what [Vinh] is asking for, nor [could] he clearly explain or compare data in the Ops Tracker to the Financial close package." (*Id.*)  For the third goal— requiring a plan for any data discrepancies—Huber noted that at least once, Vinh was unable to explain how he would use data in meetings, and had to be "walked through in detail an example of how [such an] explanation should go and how to use the data" at issue. (*Id.*)  Importantly, Huber noted that Vinh had "a base idea of how to do the job but significantly lacks analytical skills" required to know "what to do with the data once he summarizes it."  (*Id.*)  Finally, with respect to the fourth goal—requiring accurate presentations free and clear of major wording and formatting mistakes—Huber concluded

18

that Vinh "still isn't capable of putting together a clean and accurate presentation" and that during the plan, "the only time [Huber was given] a decent presentation was when [she] provided the template and gave [Vinh] very detailed explanations of exactly what [she] wanted to see in every section of every slide[,]" and even then she "had some tweaks . . . in order to make [it] useable for Ops leadership." (*Id.*) She also highlighted Vinh's March 16, 2016 email, indicating that it "made absolutely no sense" because it contained "incomplete thoughts, wrong use of words and was almost impossible to interpret." (*Id.*)

### 8.  Termination and Minnesota Department of Human Rights Discrimination Charge

In light of Vinh's failure to successfully complete his Success Rx plan, Huber decided to pursue termination. (Huber Dep. Tr. at 175.) She contacted ESSC's HR team and submitted a request for authorization to terminate Vinh. (*Id.* at 181–182.) While Vinh had no disciplinary history with ESSC, Jennifer Morris, an HR team member for ESSC, testified that it was common for the company to terminate someone for failing a Success Rx plan, even if they lacked any prior disciplinary record. (Morris Dep. Tr. at 59.) In conjunction with Huber's request for authorization to terminate Vinh, a "termination summary" was created setting forth the reasons Huber thought Vinh should be terminated. (*See* Shillingstad Decl. Ex. GG (Vinh Termination Summary) [Doc. No. 44].) The summary restated the details about Vinh's Success Rx plan, concluded that Vinh had "failed to make the necessary improvements" under the Plan, and restated Huber's Success Rx plan comments noted above. (*Id.*) It ultimately recommended that Vinh be terminated based on his failure to improve his performance "following his Threshold rating and during

the 60 day SuccessRx."[4]  (*Id.*)  Following approval by HR, Vinh was terminated on May

4, 2016.  (Morris Dep. Tr. at 74.)[5]

### C.   Procedural History

On May 18, 2018, Vinh filed suit against ESSC in Minnesota state court.  (*See*

Compl.)  His complaint asserts one count of disability discrimination and failure to provide

reasonable accommodations under the Minnesota Human Rights Act, Minn. Stat.

§ 363A.08.  (Compl. ¶¶ 12–16.)[6]  ESSC subsequently removed the case to this Court based

on diversity jurisdiction.  (*See* Def.'s Notice of Removal at 3–4.)  Following discovery,

ESSC moved for summary judgment.  (*See* Def.'s Mot. for Summ. J. [Doc. No. 39].)  The

---

[4]      It is worth noting that the Termination Summary answered "No" in the section
asking whether Vinh was under Americans With Disabilities (ADA) work restrictions.
(Vinh Termination Summary.)  Jennifer Morris explained that the reason the document
said "No" on that category was because Vinh had returned to full-time, non-restricted work
on April 18, before the end of his Success Rx plan, and accordingly was not subject to any
disability-related work restrictions at the time of his termination.  (Morris Dep. Tr. at 78.)

[5]      After his termination, Vinh filed a charge with the Minnesota Department of Human
Rights, asserting that his cervical dystonia disability was the cause of his termination.
(Vinh Dep. Tr. at 193–194.)  The Department issued a "no probable cause" determination
on Vinh's charge and declined to pursue the case.  (*Id.* at 197.)

[6]      Vinh complaint also asserted unlawful reprisal and failure to engage in an
interactive process with respect to any disability accommodations under Minnesota law.
(Compl. ¶¶ 13–15.)  However, Vinh subsequently abandoned his reprisal claim (*see* Vinh
Dep. Tr. at 213; Shillingstad Decl. Ex. HH (Pl.'s Answers to Def.'s First Set of Interrog.'s)
[Doc. No. 44] at 14 (withdrawing retaliation/reprisal claim)), and admitted that the
Minnesota Supreme Court recently held that Minnesota law does not require an interactive
process for determining reasonable accommodations.  (*See* Pl.'s Opp'n Mem. at 37); *see
also McBee v. Team Indus., Inc.*, 925 N.W.2d 222, 229 (Minn. 2019) ("We hold that the
Minnesota Human Rights Act does not mandate that employers engage employees in an
interactive process to determine whether reasonable accommodations can be made.").

motion has been fully briefed and argued.  (*See* Def.'s Mem.; Pl.'s Opp'n Mem.; Def.'s Reply Mem. [Doc. No. 49]; Minute Entry for Oral Arg. [Doc. No. 50].)

## II.    DISCUSSION

A court may grant summary judgment if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a). The burden of establishing the nonexistence of any genuine issue of material fact is on the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A party opposing summary judgment " 'must set forth specific facts showing that there is a genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.' "  *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).  The opposing party "may not merely point to unsupported self-serving allegations" to create a dispute of fact; rather, a plaintiff must "substantiate [his] allegations with sufficient probative evidence that would permit a finding in [his] favor."  *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (citation omitted) (internal quotation marks omitted).  A dispute of fact is "genuine" if "a factfinder could reasonably determine the issue in the non-moving party's favor." *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 714 (8th Cir. 2019) (citing *Anderson*, 477 U.S. at 248).  A factfinder's determination of an issue is only reasonable if "it is based on 'sufficient probative evidence' and not on 'mere speculation, conjecture, or fantasy.' "  *Id.* (quoting *Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018) (citation omitted)).

The Court first addresses Vinh's discriminatory discharge claim.  It then addresses his failure-to-accommodate claim.

### A.     Discriminatory Discharge Claim

Vinh asserts that ESSC discriminated against him by terminating him because of his disability in violation of the MHRA, specifically Minn. Stat. § 363A.08, subd. 2(2). (Compl. ¶ 12.)  Pursuant to Minn. Stat. § 363A.08, subd. 2(2), "it is an unfair employment practice for an employer, because of . . . disability . . . to . . . discharge an employee . . . ." To survive summary judgment on his discriminatory discharge claim, Vinh must demonstrate discriminatory intent "by either direct evidence or by circumstantial evidence in accordance with the burden-shifting test the United States Supreme Court set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Ferguson v. C/Base, Inc.*, No. A08-2125, 2009 WL 2927961, at *2 (Minn. Ct. App. Sept. 15, 2009).  Because Vinh makes no assertion of direct evidence of discrimination—and the Court sees none in the record— the *McDonnell Douglas* burden-shifting framework applies to his claim.

Under the burden-shifting framework, applied to a claim for disability discrimination under the MHRA, Vinh has the initial burden of setting forth a prima facie case of discrimination.  *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 542 (Minn. 2001)  "As applied to the discriminatory discharge setting[,]" including disability discrimination, Vinh "must show that [he]: '(1) is a member of [a] protected class; (2) was qualified for the position from which [he] was discharged; and (3) was replaced by a non-member of the protected class.' "  *Id.* (citation omitted); *see also Gensmer v. Minn. Dep't of Labor & Indus.*, No. A19-0379, 2019 WL 7142131, at *3–4 (Minn. Ct. App. Dec. 23, 2019) (confirming that all three elements are required under the MHRA for disability discrimination claims, including the requirement that plaintiff demonstrate that he was

"replaced by a non-member of the protected class"). If Vinh makes out his prima facie case, the burden "shifts to [ESSC] who, in order to avoid summary judgment, must produce admissible evidence sufficient to allow a reasonable trier of fact to conclude that there was a legitimate, nondiscriminatory reason for the discharge." *Hoover*, 632 N.W.2d at 542 (citation omitted). If such a reason is provided, "the presumption of discrimination disappears and the plaintiff has the burden of establishing that the employer's proffered reason is a pretext for discrimination." *Id.* (citing *Hasnudeen v. Onan Corp.*, 552 N.W.2d 555, 557 (Minn. 1996)).

### 1.    Prima Facie Case

The Court first addresses whether Vinh has set forth a prima facie case of discriminatory discharge based on disability. ESSC does not appear to contest the first element of Vinh's claim, namely, that Vinh's disability renders him a member of a protected class. (*See* Def.'s Mem. at 25–26.) Accordingly, only the second element (whether Vinh was qualified for his position) and the third element (whether Vinh was replaced by a non-disabled person) are in dispute.[7]

---

[7] In its reply, ESSC asserts that Vinh abandoned his discriminatory discharge claim by failing to respond to ESSC's analysis. (Def.'s Reply Mem. at 6.) While the Court acknowledges that Vinh's opposition brief is somewhat unclear on this point, the substance of Vinh's argument addresses the claim in a manner sufficient to avoid abandonment. (*See* Pl.'s Opp'n Mem. at 34–35 (asserting he could perform essential job functions), 36–37 (asserting he was not required to show replacement by non-disabled individual).) Moreover, at oral argument, Vinh asserted he had not abandoned his discriminatory discharge claim.

### a.  Vinh Was Minimally Qualified For The Position From Which He Was Discharged

To establish the second element of his prima facie case, Vinh must show that he was "qualified for the position from which [he] was dismissed[,]" which requires only that Vinh show that "[he] met the minimum objective qualifications for the job." *Hoover*, 632 N.W.2d at 544 (citing *Legrand v. Trustees of Univ. of Ark. at Pine Bluff*, 821 F.2d 478, 481 (8th Cir. 1987)).  At this stage in the analysis, "the question . . . is not whether [Vinh] performed well in [his] job, but simply whether [he] was objectively qualified to hold the position, such as by [his] skills or education." *Lewis v. CAN Nat'l Warranty Corp.*, 63 F. Supp. 3d 959, 964 (D. Minn. 2014) (citing *McGinnis v. Union Pacific R&R.*, 496 F.3d 868, 875 n.3 (8th Cir. 2007) (explaining that at qualification prong of prima facie case, plaintiff need not anticipate and disprove reasons given for discharge)).  The "burden is not intended to be onerous." *McCracken v. Carleton College*, 969 F. Supp. 2d 1118, 1128 (D. Minn. 2013) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

ESSC argues that Vinh was not qualified for his position because of his poor performance reviews, his passive and unclear communication style and subpar critical thinking and goal setting skills.  (Def.'s Mem. at 27.)  ESSC also notes that he was the lowest performing employee among his peer group in 2015 and did not successfully complete his Success Rx plan.  (*Id.* at 27.)  And, ESSC argues, even after the company provided all accommodations required by Vinh's doctor—as set forth in Vinh's RTW form—Vinh still failed to adequately perform the essential functions of his position.  (*Id.* at 28.)  In response, Vinh asserts that there are genuine issues of material fact regarding the

essential functions of his position, and that in any event, he adequately performed several "essential" functions that were not listed in his job description. (Pl.'s Opp'n Mem. at 34.) He also asserts that he need only establish that he met the minimum objective qualifications for his position (*Id.* at 35) and that his target rating in 2014, and positive ratings for every year prior to 2013 (which ESSC does not dispute), indicate he met the minimum qualifications for his position. (*Id.*) Alternatively, he argues that the Court lacks evidence showing whether Vinh could have performed his job with reasonable accommodations— and that such a lack of evidence creates a fact question—because ESSC never implemented his request for a standing desk, and because the company failed to comply with restriction number 10 on Vinh's RTW form related to "visual stimulation" and stress. (*Id.* at 36.)

In light of the minimal burden noted above, the Court finds that Vinh was minimally qualified for his position.[8] According to ESSC's job description for the senior project manager position—the position Vinh held from 2006 through his termination in 2016 (Vinh Dep. Tr. at 65–67, 69)—the position required a bachelor's degree in a relevant discipline, several years of relevant experience (less with a master's degree), computer

---

[8] In its brief, ESSC conflates element two of Vinh's prima face case of disability discrimination—which requires only that Vinh show he met the minimum objective qualifications for his position, *see supra* § II(A)(1)(a)—with element two of the modified prima facie case for a failure-to-accommodate claim, which requires Vinh to show he was capable of performing the essential functions of his position with or without reasonable accommodation. *See Hoover*, 632 N.W.2d at 542 (noting that plaintiff need "only establish that [he] met the minimum objective qualifications for the job" for a discriminatory discharge claim); *Id.* at 547 (noting that for a failure-to-accommodate claim under the MHRA, a "qualified disabled person" is a "disabled person 'who, with reasonable accommodation, can perform the *essential* functions' of the job in question" (emphasis added)); *see also Kammueller*, 383 F.3d at 786.

skills, and the ability to manage and conduct complex analysis ranging from issue identification to proposal of potential solutions, among other things.  (*See* Senior Project Manager Job Description.)  Vinh has both a bachelor's degree and master's degree, years of experience with the company, and worked in the position for ten years.  (Vinh Dep. 21, 27-28, 65–67, 69.)  Moreover, the record discloses only two negative performance reviews during that time—2013 and 2015—meaning that for eight of the ten years he held the senior project manager position, the Court must infer that he met the minimum requirements of the position.  (*See* 2013 Vinh Performance Review; 2015 Vinh Annual Review); *see also Grinnell Mut. Reinsurance Co.*, 685 F.3d at 700 (requiring the Court to view the record in the light most favorable to the nonmoving party).  There is no genuine issue of material fact in dispute as to whether Vinh was minimally qualified for his position.  *See Lewis*, 63 F. Supp. 3d at 964 (concluding that employee who adequately fulfilled her job requirements "for several years before any significant concerns were raised about her performance" had established qualified-for-position prong of prima facie case).

ESSC's arguments to the contrary are unavailing.  Essentially, ESSC contends that the performance issues that purportedly gave rise to Vinh's termination demonstrate he was objectively unqualified for the position.  (*See* Def.'s Mem. at 27–28.)  Yet the Eighth Circuit has rejected that exact argument as "short-circuiting the analysis under the *McDonnell Douglas* framework," *McGinnis*, 496 F.3d at 875 n.3 (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)), because it interprets the qualification prong "in such a way as to shift onto the plaintiff an obligation to anticipate

and disprove, in his prima facie case, the employer's proffer of a legitimate non-discriminatory basis for its decision." *Slattery*, 248 F.3d at 92.

Accordingly, Vinh has established the second element of his prima facie case of discriminatory discharge.

### b.    Vinh Has Failed To Show That He Was Replaced By A Non-Disabled Person

The third element of Vinh's discriminatory discharge claim requires that Vinh establish that he was replaced by a non-disabled person. *Gensmer*, 2019 WL 7142131, at *4. ESSC argues that Vinh has failed to offer any such comparator evidence. (Def.'s Mem. at 27–28.) In response, Vinh asserts that he is not required to show that he was replaced by a non-disabled individual because Eighth Circuit precedent applying the MHRA does not require that showing as an element. (*Id.* at 36–37 (citing *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1182–83 (8th Cir. 2019), *reh'g denied* (Mar. 21, 2019) (noting that MHRA and Americans With Disabilities Act (ADA) claims are analyzed using the same standard, and listing elements of discriminatory discharge without replacement requirement)).)

In *Brunckhorst*, the Eighth Circuit observed that discriminatory discharge claims—whether under the ADA or MHRA—are generally analyzed under the same legal burden-shifting framework (where direct evidence of discrimination is absent). *See Brunckhorst*, 914 F.3d at 1183 (citation omitted). As Vinh notes, the Eighth Circuit did not list "replacement by a non-disabled individual" as an element of such claims in its *Brunckhorst* decision. *Id.* However, that case dealt with a discriminatory discharge claim where the

employee's position had been *eliminated*; no one could have replaced the employee because the position no longer existed. *Id.* at 1181. Where the employee's former position still exists, such as in *Boldt v. Northern States Power Company*, the Eighth Circuit has described the elements of an MHRA-disability- based discriminatory discharge claim as requiring a showing that the employee was replaced by a non-member of his or her protected class. 904 F.3d 586, 591 (8th Cir. 2018) (citation omitted). Moreover, recent Minnesota Court of Appeals cases have reiterated this requirement. *Gensmer*, 2019 WL 7142131, at *4 (holding that terminated employee who brings a discharge-related disability discrimination claim under the MHRA *must* show that "he was replaced by a non-member of the protected class"); *Clarke v. Nw. Respiratory Services, LLC*, No. A16-0620, 2017 WL 393890, at *4 (Minn. Ct. App. Jan. 30, 2017) (noting that "[i]n order to make a prima facie case of discriminatory discharge, a plaintiff must show that he . . . was replaced by a non-member of the protected class"). Accordingly, to establish a prima facie case of discriminatory discharge, Vinh was required to show that he was replaced by a non-disabled individual.

Here, Vinh offers no evidence showing he was replaced by a non-disabled individual, and the Court sees none in the record. Accordingly, Vinh has failed to establish this element of his prima facie case and has failed to establish a prima facie case overall for discriminatory discharge.

### 2.    Legitimate Non-Discriminatory Reason for Discharge & Pretext

Even assuming Vinh set forth a prima facie case of disability discrimination—which he has not—ESSC would still be entitled to summary judgment. Under the *McDonnell*

*Douglas* framework, if Vinh had set forth a prima facie case, the burden would then shift to ESSC to proffer a legitimate non-discriminatory reason for terminating Vinh. *Hoover*, 632 N.W.2d at 542 (citation omitted).  To meet that prong, ESSC's reason " 'must only be one that, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.' " *Aase v. Wapiti Meadows Cmty. Techs. & Services, Inc.*, 832 N.W.2d 852, 857 (Minn. Ct. App. 2013) (citation omitted).  If ESSC does so, the burden shifts back to Vinh to demonstrate that ESSC's proffered reason is pretext for discrimination.

It is well established that "performance-related concerns constitute legitimate, non-discriminatory justifications for discharging [an employee]." *Fiero v. CSG Systems, Inc.*, 759 F.3d 874, 878 (8th Cir. 2014) (citing *Barnhardt v. open Harvest Co-op.*, 742 F.3d 365, 372 (8th Cir. 2014) (same); *Chambers v. Travelers Cos., Inc.*, 668 F.3d 559, 567 (8th Cir. 2012) (noting that "performance deficiencies" constitute a legitimate, non-discriminatory basis for discharge)).  And the failure to complete a performance improvement plan has also been recognized as a valid non-discriminatory basis for dismissal.  *See Lewis*, 63 F. Supp. 3d at 966 (concluding that employer's proffered reason for dismissal—failure to improve in specific areas outlined on performance improvement plan—was sufficient).  Here, ESSC has identified significant problems with Vinh's performance in 2013 and 2015, as well as his failure to successfully complete his Success Rx plan (i.e., performance improvement plan).  *See supra* § I(B)(3)–(4), (6)–(8); (Def.'s Mem. at 30–31.)  Accordingly, ESSC has set forth a legitimate non-discriminatory reason for Vinh's termination.

Given ESSC's proffer, the burden shifts back to Vinh to establish "that the employer's proffered reason is a pretext for discrimination." *Hoover*, 632 N.W.2d at 542 (citations omitted).   A plaintiff may establish pretext by showing that other similarly situated individuals who are not in the plaintiff's protected class were treated differently, or by demonstrating that some other factual basis underlying the employer's proffered explanation is "unworthy of credence." *Bernard v. St. Jude Med. S.C., Inc.*, 398 F. Supp. 3d 439, 460 (D. Minn. 2019) (citing *Russell v. Kansas City, Mo.*, 414 F.3d 863, 868 (8th Cir. 2005); *Fiero*, 759 F.3d at 878)) (internal quotation marks omitted).   Still, because the Court does " 'not sit as a super-personnel department[],' this 'pretext' inquiry must focus solely on whether evidence in the record shows that a business's action against an employee 'involve[d] intentional discrimination [],' *not* on whether the business's action was 'wise' or 'fair' as a general matter." *Id.* (quoting *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 955 (8th Cir. 2012)).   Put another way, " 'it is not [the Court's] province to decide whether [the employer's] reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.' " *Id.* (quoting *Wilking v. Ramsey Cty.*, 153 F.3d 869, 873 (8th Cir. 1998)).

At no point in his opposition brief—or during oral argument for that matter—does Vinh ever assert that ESSC's claimed reason for terminating him was pretext.   To the contrary, Vinh does not believe ESSC discriminated against him at any time prior to the time he went on leave at the end of September 2015.   (Vinh Dep. Tr. at 134.)   In fact, Vinh does not recall his condition—even in its early stages—having any impact on the quality of his work besides having to take days off to see his doctor, which he admits ESSC readily

30

accommodated.  (*Id.* at 122–123, 139–140.)  Vinh also admits that his "threshold" rating in 2015 was based on conduct that occurred prior to his disability leave.  (*Id.* at 199.)

Vinh's only argument for pretext appears to be that he was set up to fail under his Success Rx plan because the Success Rx plan makes no mention of his RTW restrictions, disability, or six-hour workday.  (Pl.'s Opp'n Mem. at 24.)  Moreover, Vinh asserts that he received no feedback from Huber regarding his progress on the Success Rx plan's goals, and that Huber cancelled more than half of the presentations and meetings that Vinh set up in order to be successful on the plan.  (*Id.* at 26–27.)  Finally, he contends that his inability to explain data—a concern under his Success Rx plan—stemmed from the fact that "he was not clear on the direction being given him by his supervisor[,]" not any inability on his part.  (*Id.* at 27.)

The Court finds that Vinh has failed to establish a genuine dispute of material fact with respect to pretext.  Vinh's assertion that his Success Rx plan did not take into account his disability is contrary to record evidence.  While the plan makes no mention of his disability or work restrictions, Huber testified that she drafted the plan while aware of Vinh's work restrictions (*see* Huber Dep. Tr. at 147–151 (noting that the Success Rx plan was drafted "knowing [Vinh] was working a 6 hour day"), and "double-checked" with HR to ensure that the plan could function in light of Vinh's restrictions.  (*See* Morris Dep. Tr. at 37, 46; Mar. 15, 2016 Huber-Morris Email re: Vinh's RTW Restrictions and PIP).)  Vinh's own plan—written by him based on input from Huber—for succeeding under the plan also fails to mention his restrictions.  (*See* Vinh's Plan for Meeting Success Rx Plan.)  And in any event, Vinh's own doctor testified that ESSC complied with all the limitations

set forth in Vinh's RTW form (Spurrill Dep. Tr. at 83–84), and that Vinh never expressed an inability to do his job even while the Success Plan was ongoing.  (*Id.* at 96.)

Vinh's assertion that Huber failed to provide him feedback or direction is also contrary to record evidence.  Vinh and Huber met routinely during the plan (Vinh Dep. Tr. at 174, 178; Huber Dep. Tr. 155–156), and Vinh acknowledges that he received feedback on the poor quality of his written communications (Vinh Dep. Tr. at 175) as well as his continued failure to provide Huber with properly formatted information.  (*Id.*)  On at least one occasion, Huber expressly followed up on a poorly-written communication Vinh had sent to her, noting that Vinh's email had not been written clearly, correcting his prior email to show him how he could have made his message clearer, and offering Vinh the chance to further discuss the issue if he felt it was necessary.  (Mar. 16, 2016 Huber-Vinh Email.)

Finally, to the extent Vinh argues that Huber cancelled meetings so that he would fail (an assertion for which he offers no affirmative evidence), or that his inability to explain data stemmed from his supervisor's failure to provide clear direction, such contentions constitute disagreements with his employer about his performance.  This Court will not second-guess ESSC's judgment of its employee's performance absent some evidence— entirely lacking here—of intentional discrimination.  *Fercello v. County of Ramsey*, 612 F.3d 1069, 1080 (8th Cir. 2010) (citing *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 916 (8th Cir. 2007) (noting that the federal courts do not sit as "super-personnel departments reviewing the wisdom and fairness of the business judgments . . . except [where] those judgments involve intentional discrimination" (citation omitted) (internal quotation marks omitted))).

In summary, Vinh has failed to establish a prima facie claim of discriminatory discharge.  Even assuming he had, however, ESSC has proffered a legitimate non-discriminatory reason for his termination—poor performance—and Vinh has failed to raise a genuine dispute of material fact that ESSC's reason was pretext for discrimination. Accordingly, ESSC's motion for summary judgment on Vinh's discriminatory discharge claim is granted.

### B.       Failure-To-Accommodate Claim

Vinh also asserts that ESSC failed to provide reasonable accommodations for his disability as required by Minn. Stat. § 363A.08, subd. 6.  (Compl. ¶ 13.)  Pursuant to the MHRA, it is an unlawful employment practice for a qualified employer[9] to "not make reasonable accommodation to the known disability of a qualified disabled person . . . unless the employer . . . can demonstrate that the accommodation would impose an undue hardship on the business . . . ."  *Id.*, subd. 6(a).  The phrase "reasonable accommodation" means "steps which must be taken to accommodate the known physical or mental limitations of a qualified disabled person[,]" which may include, although is not limited to nor necessarily requires: "(1) making facilities readily accessible to and usable by disabled persons; and (2) job restructuring, modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, and the provision of aides on a temporary or periodic basis."  *Id.*; *see also id.*, subd. 6(b) (listing several factors

---

[9]      For this provision, a qualified employer is an employer with at least 15 part-time or full-time employees working in each of 20 or more calendar weeks in the current or preceding calendar year.  Minn. Stat. § 363A.08, subd. 6.  There is no dispute that ESSC meets this standard.

to be considered in evaluating whether an accommodation would impose an undue hardship on the employer).

With respect to Vinh's failure-to-accommodate claim, the *McDonnell Douglas* analysis does not apply. *Ferguson*, 2009 WL 2927961, at *2 (citing *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 788 (8th Cir. 2004) (stating "it is not necessary to apply the *McDonnell Douglas* framework to the prima facie case for a reasonable accommodation claim")); *see also Hoover*, 632 N.W.2d at 545–47 (addressing failure-to-accommodate claim separately and only applying burden-shifting framework to discriminatory discharge claim). Rather, courts use a "modified burden-shifting analysis." *Collins v. Abbot Labs., Inc.*, No. 17-cv-4534 (NEB/SER), 2019 WL 2718323, at *4 (D. Minn. June 28, 2019) (quoting *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074 (8th Cir. 2006)). Vinh must first establish a prima facie case that he was "(1) disabled within the meaning of the MHRA, (2) qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) suffered an adverse employment action because of his disability." *Kammueller*, 383 F.3d at 784 (citing *Kiljedah v. Ryder Student Trans. Services, Inc.*, 341 F.3d 836, 841 (8th Cir. 2003)). Then, Vinh must show that ESSC "knew of, and failed to reasonably accommodate, his disability." *Id.* (citing Minn. Stat. § 363A.08, subd. 6); *see also Ferguson*, 2009 WL 2927961, at *2 (citing *Hoover*, 632 N.W.2d at 547).

Here, ESSC does not dispute that Vinh is disabled within the meaning of the MHRA, nor does it dispute that it knew of his disability. (*See* Def.'s Mem. at 32–33.) However, ESSC argues that Vinh is not a "qualified" disabled person—i.e., able to perform the essential functions of his position with or without reasonable accommodation—and

that in any event, ESSC provided all reasonable accommodations required by Vinh's doctor to accommodate his disability.  (*Id.* at 33–36.)

1. **Vinh Has Failed To Show That He Is A "Qualified" Disabled Person Capable of Performing The Essential Functions Of His Position With Reasonable Accommodation.**

In order to meet this element of his prima facie case for his failure-to-accommodate claim, Vinh must show that he is a qualified disabled person, which is "a disabled person, who with reasonable accommodation, can perform the essential functions required of all applicants for the job in question."  Minn. Stat. § 363A.03, subd. 36(1).  Put another way, Vinh must show (1) "that he meets the essential prerequisites for the job, such as basic education, experience and training,"; and (2) "that he can perform the essential functions of the job with or without reasonable accommodation."  *Kammueller*, 383 F.3d at 784 (citation omitted).  Whether Vinh was qualified is measured at the time of the adverse employment action.  *Otto v. City of Victoria*, 834 F. Supp.2d 912, 914 (D. Minn. 2011), *aff'd* 68 F.3d 755 (8th Cir. 2012).  If Vinh required an accommodation, he must "make a facial showing that an accommodation is possible, and, with it, he can perform the essential functions of the job."  *Kammueller*, 383 F.3d at 784 (citation omitted).

Essential functions of a job are "fundamental job duties" and the employer's judgment in this regard—while not dispositive—is considered "highly probative."  *Id.* (citing *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003)) (internal quotation marks omitted).  Essential duties do not include "marginal functions" of the position.  *McBee*, 925 N.W.2d at 231 (citation omitted).  In determining whether a function is essential, courts look to "(1) the employer's judgment as to which functions are essential;

(2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs." *Kammueller*, 383 F.3d at 786 (citation omitted) (internal quotation marks omitted).

As noted above, *supra* § II(A)(1)(a), Vinh was at least minimally qualified for his position. Accordingly, the question becomes whether Vinh has raised a genuine dispute of material fact about whether he could perform the *essential* functions of his position with or without reasonable accommodation. *Kammueller*, 383 F.3d at 786. While the parties dispute the exact nature of Vinh's essential functions, it is undisputed that Vinh was responsible for directing strategic projects, developing continuous improvement plans to drive further business, and communicating strategic planning initiatives in both written and verbal form, among other things. (*See* Vinh Dep. Tr. at 67–69.) Vinh acknowledges that "communication" was a skill that was "important in the organization" (*id.* at 84), and that was also listed as a "minimum qualification" for the position. (Senior Project Manager Job Description at 2 (requiring "[s]trong verbal and written communication and organizational skills"; *Id.* at 3 (noting that "[c]ommunication" was a "[m]ajor" part of the position, occurring 60% or more during the work hours).) The senior project manager job description also requires, as "essential" qualifications, that the applicant be able to analyze complex situations and distill "issues into options" with appropriate solutions. (*Id.* at 1.) In Vinh's own words, "a lot of [his job] was managing a lot of different cross-functional

teams within the organization and then making sure that [] projects went from start to finish." (Vinh Dep. Tr. at 68–69.)

Here, Vinh has failed to show that he could perform the essential functions of his job even before his disability began inhibiting his ability to work. Vinh admits that for the time period encompassed by his 2015 Annual Review—the first half of 2015 prior to his FMLA leave—he does not believe anyone at ESSC engaged in any discrimination towards him, and acknowledges that his disability was not interfering with his ability to do his job. (*See* Vinh Dep. Tr. at 122–123, 134.) Yet despite the lack of any interference by a disability, Vinh received a "threshold" rating for his performance in 2015 (*see* 2015 Vinh Annual Review), indicating that he was not meeting ESSC's expectations regarding his job requirements. (Morris Dep. Tr. at 29.) His review indicated that he needed to improve his communication skills, leadership skills, and his critical thinking skills—all essential, and in some cases, *minimum* requirements for his position. (*See* Senior Project Manager Job Description.) Moreover, despite the fact that his job involved analyzing complex situations and directing strategic initiatives, Vinh was rated "threshold" on his attention to detail, with his supervisor noting that she often had "to question [him] on whether or not what he is reporting [to her] makes sense to him[.]" (2015 Vinh Annual Review.) Even when his disability was not affecting his work, Vinh was not performing the essential functions of his position.

Vinh has also failed to show that he could perform the essential functions of his position even with reasonable accommodation. He argues that there is a genuine dispute of material fact over whether he could have performed the essential functions of his

position if ESSC had followed the restrictions set forth in restriction number 10 of his RTW form—listing stress and "visual stimulation" as his doctor's primary concern—and had issued him a standing desk. (Pl.'s Opp'n Mem. at 36.) However, Vinh has failed to show how either of his proposed accommodations "would render him otherwise qualified" to perform the essential functions of his position. *Schwarzkopf v. Brunswick Corp.*, 833 F. Supp. 2d 1106, 1122 (D. Minn. 2011) (quoting *Mershon*, 442 F.3d at 1077).

With respect to the stress and visual stimulation limitations set forth in restriction number 10, Vinh offers no explanation as to why those accommodations would render him otherwise qualified to perform his job and allow him to improve his critical thinking, communication, and leadership skills, particularly in light of the fact that Vinh was not meeting ESSC's standards on those qualities *before* his diagnosis with cervical dystonia. (*See* Vinh Termination Summary); *see also Hustvet v. Allina Health Sys.*, 910 F.3d 399, 410 (8th Cir. 2018) (noting that "in order for the [requested] accommodation to be reasonable" in a manner that would permit the employee to perform their job, "the request *must relate to the individual's disability*" (emphasis added)). Moreover, "[a]sking an employer to reduce the 'stress' of the workplace is an ambiguous, perhaps unattainable goal, and is not a reasonable accommodation." *Vandeveer v. Fort James Corp.*, 192 F. Supp. 2d 918, 940 (E.D. Wis. 2002) (citation omitted), *aff'd* 66 Fed. App'x 16 (7th Cir. 2003); *see also Cannice v. Norwest Bank Iowa, N.A.*, 189 F.3d 723, 728 (8th Cir. 1999) ("We do not believe . . . that the obligation to make reasonable accommodation extends to providing an aggravation-free environment."); *Weesner v. U.S. Bancorp*, No. 10-cv-2164 (RHK/LIB), 2011 WL 4471765, at *7 (D. Minn. Sept. 26, 2011) (noting that "vague and

38

ambiguous accommodation request[s]" are "inherently unworkable and, hence, unreasonable" (citation omitted)). And in any event, Vinh's own doctor testified that restriction number 10 did not require anything specific from ESSC, and that the other restrictions set forth in the RTW form—such as the limits on sitting, a six-hour work day, etc.—were already designed to address his "statement of general concern" about stress and visual stimulation in restriction number ten. (Spurrill Dep. Tr. at 83–84, 117.)

Vinh's purported request for a standing desk is equally unavailing. Even assuming Vinh requested a standing desk from his supervisor, he offers no explanation as to how the accommodation, if provided, would have rendered him otherwise qualified to hold his position in light of the performance problems that existed prior to his disability and which gave rise to ESSC's stated basis for his termination. *See Schwarzkopf*, 833 F. Supp. 2d at 1122. Moreover, while Vinh's RTW form is silent as to a standing desk, the form does include other standing-related restrictions that account for the need to avoid sitting for long periods of time. (*See* Vinh's RTW Form.) While it may be true that Vinh would have preferred to have a standing desk as the method of choice to facilitate his doctor's restrictions, "an employer is not required to provide an accommodation that is requested or preferred by an employee" so long as the accommodation that is provided is "reasonable." *Brunckhorst v. City of Oak Park Heights*, 283 F. Supp. 3d 746, 755 (D. Minn. 2017), *aff'd*, 914 F.3d 1177. And in any event, Vinh's physician, Dr. Spurrill, also testified that he was not sure whether a standing desk would have been helpful to Vinh's condition. (Spurrill Dep. Tr. at 86). ESSC "cannot be expected to accommodate limitations . . . which are not supported by medical documentation." *Brunckhorst*, 283 F. Supp. 3d at 755.

Finally, Vinh contends that ESSC could have reassigned him to another other role in the company where he could have been successful, and that "reasonable accommodation includes reassignment to a vacant position." (Pl.'s Opp'n Mem. at 34–35.) The Court finds this argument to be unavailing. While reassignment is a possible accommodation option contemplated by the MHRA, it is "an accommodation of last resort" and requires the employee to seek an "existing [vacant] position within the company; the employer is not required to create a new position as an accommodation." *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1019 (8th Cir. 2000). Vinh does not identify any other vacant position at ESSC to which he could have been reassigned and performed at ESSC's expectations, much less that he ever sought reassignment to another position, which renders this claim baseless. *See Otto*, 68 F.3d at 759 (rejecting reassignment accommodation where plaintiff failed to identify vacant position and never applied for such a position).

In summary, Vinh has failed to establish that he is a "qualified" disabled person for the purposes of his failure-to-accommodate claim.

### 2. Vinh Has Failed To Show That ESSC Did Not Provide Reasonable Accommodations For His Disability

Even if Vinh could show that he was a "qualified" disabled person, and further assuming he could establish the rest of his prima facie failure-to-accommodate claim, he cannot show that ESSC failed to provide reasonable accommodations for his disability.[10]

---

[10] Vinh cites to this Court's decision in *Miles v. Northcott Hosp. Int'l, LLC*, 963 F. Supp. 2d 878, 898 (D. Minn. 2013), for the proposition that "[f]ailure to make a good faith effort to assist a plaintiff in seeking an accommodation is a fact issue that precludes

As noted above, Vinh admits that ESSC informed him that it would accommodate the restrictions set forth by Dr. Spurrill in his RTW form. (Vinh Dep. Tr. at 143.) Moreover, Huber made it clear to Vinh that he was to follow the requirements and limitations set forth in his RTW form. (Huber Dep. Tr. 105, 126.) Importantly, Vinh's own physician testified that to the best of his knowledge, ESSC complied with each and every one of the restrictions listed in Vinh's RTW form, including his statements about stress and visual stimulation listed in restriction number ten. (Spurrill Dep. Tr. at 83–84, 117.) Vinh's assertion that ESSC was obligated to do more lacks record support. *Anda*, 517 F.3d at 531 (noting that the party opposing summary judgment "may not merely point to unsupported self-serving allegations" to create a dispute of fact). To the extent Vinh asserts ESSC should have reduced his stress, such a demand seeks an unreasonable accommodation, *see Vandeveer*, 192 F. Supp. 2d at 940; *see also Cannice*, 189 F.3d at 728; *Weesner*, 2011 WL 4471765, at *7.

Finally, with respect to a standing desk, even if one was requested, ESSC was not obligated to provide the accommodation absent medical documentation indicating it was appropriate or necessary for Vinh's disability, *see Brunckhorst*, 283 F. Supp. 3d at 755, or that it would have rendered him otherwise qualified for the position. Yet Dr. Spurrill testified that he was not sure whether a standing desk would have been helpful to Vinh's

---

summary judgment." (Pl.'s Opp'n Mem. at 31–32.) That decision, however, referenced good faith within the framework normally used to evaluate whether an employer has failed to participate in an interactive process to devise a reasonable accommodation. *Miles*, 963 F. Supp. 2d at 897. That framework no longer applies in light of the Minnesota Supreme Court's recent holding that the MHRA does not require an interactive process for reasonable accommodation claims. *See McBee*, 925 N.W.2d at 229.

condition, and explained that he never listed a standing desk as a restriction for Vinh's work because "the change in position" over the course of the day—which was addressed by his other RTW restrictions—was what he considered most important. (Spurrill Dep. Tr. at 65, 86.) And even if Vinh would have preferred a standing desk over the other RTW restrictions that addressed his need to avoid sitting for long periods of time, ESSC was under no obligation to provide Vinh his "preferred" accommodation so long as the accommodation it did provide—in this case, the ability to stand frequently throughout the workday at Vinh's leisure pursuant to the RTW form—was reasonable. *See Brunckhorst*, 283 F. Supp. 3d at 755. Accordingly, Vinh has also failed to raise a genuine dispute of material fact as to whether ESSC provided him reasonable accommodations for his disability.

In summary, Vinh has failed to establish a genuine dispute of material fact that he is a "qualified" disabled person, or that ESSC failed to provide him reasonable accommodations. Accordingly, ESSC's motion for summary judgment as to Vinh's failure-to-accommodate claim is granted.[11]

---

[11] Because the Court concludes that Vinh has failed to establish multiple elements of his failure-to-accommodate claim, it need not reach any remaining elements, such as whether any proposed accommodations, even if reasonable, would place an undue hardship on ESSC.

### III.    CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Express Scripts Services Company's Motion for Summary Judgment (Doc. No. 39) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: April 21, 2020                              s/Susan Richard Nelson
                                                   Susan Richard Nelson
                                                   United States District Judge